# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | | |
|---|---|---|
| **KRYSTAL NABORS** | * | **CIVIL ACTION NO. 11-1869** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **H S S SYSTEMS L L C, ET AL** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

Pending before the undersigned for report and recommendation is the Motion to Dismiss and Compel Arbitration filed by defendants, HSS Systems, LLC, Shelly Lee, Kathleen O'Sullivan, James Miller, and Harriet Palombo (collectively "HSS"), on October 28, 2011.  [rec. doc. 4].  Plaintiff, Krystal Nabors ("Nabors"), filed opposition on November 20, 2011.  [rec. doc. 10].  HSS filed a Reply Memorandum on November 30, 2011.  [rec. doc. 16].

On January 18, 2012, oral argument was held in open court, after which I granted Nabors leave to file a supplemental opposition to her memorandum.  [rec. doc. 17].  Nabors filed a Supplemental Opposition to Defendant's Motion to Dismiss and Compel Arbitration on January 28, 2012.  [rec. doc. 18].  On February

14, 2012, HSS filed a Reply to Plaintiff's Supplemental Memorandum. [rec. doc. 21].

On July 2, 2012, I held additional argument for the parties to address issues regarding the enforceability of the arbitration provision and recent case law.

For the following reasons, I recommend that the motion to dismiss/compel be **GRANTED**, in part, as set out below.

## Factual Background

Nabors, a black female, was employed by HSS on August 22, 1996, as an admitting representative in Opelousas, Louisiana. HSS is an affiliated subsidiary of HCA, Inc.[1] HHS is based in Houston, Texas, and contracts with facilities in the State of Louisiana to provide employees, including employees for the facility at which Nabors eventually worked, Regional Medical Center of Acadiana, formerly known as Southwest Medical Center. [rec. doc. 4, Exhibit A, ¶ 3].

In June, 1998, Nabors was employed as an admitting representative at Regional Medical Center of Acadiana in Lafayette, Louisiana. Subsequently, she was promoted to insurance verification clerk in February, 1999; admit coordinator

---

[1]In the petition, Nabors asserts that she was employed by HCA. [rec. doc. 1, ¶ 2]. However, in the Motion to Dismiss, defendants state that Nabors incorrectly identified her employer as "HCA d/b/a Houston Shared Services," and that Nabors was actually employed by HSS. [rec. doc. 4, p. 1, n. 1]. The Affidavit of Kathleen O'Sullivan, Director of Human Resources for HSS, confirms that Nabors was employed by HSS. [rec. doc. 4, Exhibit A].

2

in October, 1999; patient access supervisor in June, 2002, and patient access manager in July, 2004.

During April, 2006, HCA, Inc. instituted a Mandatory Binding Arbitration Policy (the "Policy") with an effective date of January 1, 2006.  [rec. doc. 4, Exhibit A, A-1].  The Scope of the Policy applied to "All Company-affiliated subsidiaries located in Texas including, but not limited to hospitals, ambulatory surgery centers, outpatient imaging centers, physician practices, All About Staffing, Corporate Departments, Groups, and Divisions (collectively, "Texas Affiliated Employers" and individually, Texas Affiliated Employer").  [rec. doc. 4, Exhibit A-1, p. 1].  This policy applied to HSS, an affiliated subsidiary of HCA, Inc., which is located in Houston, Texas.

The Policy provides, in pertinent part, as follows:

Under the Mandatory Binding Arbitration Policy, both the employee and the Texas Affiliated Employer [HSS] agree to give up any right either of them might have to a jury or judge trial regarding any issue governed by the Mandatory Binding Arbitration Policy.  All disputes governed by the Mandatory Binding Arbitration Policy shall be submitted to final and binding arbitration to be conducted by an experienced arbitrator from the American Arbitration Association ("AAA") chosen by the employee and the company.  The employee and the Employer have equal say in selecting an arbitrator and the arbitration will be held in the same city where the Employer is located.  The employee and the Employer will be bound by the decision made by the third party neutral arbitrator except as allowed by law to appeal to a court.

3

[Exhibit A-1, p. 1].

The Policy defines the claims which must be submitted to arbitration, and includes:

- claims relating to involuntary terminations, such as layoffs and discharges, demotions negatively affecting pay, and suspensions without pay;

- employment discrimination and harassment claims, based on race;

- retaliation claims recognized by applicable state or federal law;

- tort claims, such as negligence, defamation, invasion of privacy, infliction of emotional distress, etc.;

- claims of termination in violation of public policy.

[Exhibit A-1, p. 2].

In 2009, the Policy was referred to in HSS's Employee Handbook (the "Handbook"), which was disseminated to all employees and posted on the facility's website.  [rec. doc. 4, Exhibit A-3].  The Handbook contains a four-step Employment Dispute Resolution Process before submitting cases to arbitration. These steps are:

Step 1:      Discuss problem with your supervisor;

Step 2:      Appeal supervisor's decision to department head;

Step 3:      Appeal department head's decision to a peer review

4

panel;

Step 4:       Appeal department head's decision to the Senior Vice
              President.

[Exhibit A-3, p. 20].

Employees were permitted to use steps 1, 2, and 4 of the dispute resolution

process for any employment-related problem.  Disputes which were appealed to

the peer review panel (Step 3) had to be related to termination of employment or

loss of status or pay.

Regarding, arbitration, the Handbook provides as follows:

If your dispute is related to a disciplinary action involving
termination of employment and is not resolved in the first four steps,
you may request binding arbitration.  Binding arbitration may only be
used for the types of claims that would otherwise be heard in court.

The Handbook made it clear that it was not to be construed as an

employment contract, providing, in pertinent part, as follows:

BUT NEITHER THIS HANDBOOK NOR ANY PROVISION OF
THIS HANDBOOK IS AN EMPLOYMENT CONTRACT OR ANY
OTHER TYPE OF CONTRACT.

[Exhibit A-3, p. 1].

This provision is reiterated on the Acknowledgement Card and Receipt for

Handbook as follows:

I HAVE READ AND UNDERSTAND THE ABOVE STATEMENT AND AGREE TO READ THE EMPLOYEE HANDBOOK, WHICH I HEREBY ACKNOWLEDGE HAVING RECEIVED.  **I UNDERSTAND THAT NEITHER THIS HANDBOOK NOR ANY PROVISION OF THIS HANDBOOK IS AN EMPLOYMENT CONTRACT OR ANY OTHER TYPE OF EMPLOYMENT CONTRACT**.

(emphasis added) [rec. doc. 4, Exhibit A-3, at p. 61].

This page of the Handbook further provides:

**The Facility [HSS] reserves the right to rescind, modify or deviate from these or other guidelines, policies, practices or procedures relating to employment matters from time to time as it considers necessary in its sole discretion, either in individual or Facility-wide situations with or without notice**.

(emphasis added).

During the Spring of 2010, HSS distributed the Healthy Work Environment brochure (the "Brochure") to all employees.  [rec. doc. 4, Exhibit A, ¶ 5; Exhibit A-2].  The Brochure contained an abbreviated version of the Employment Dispute Resolution Process and arbitration as follows:

HCA's Employment Resolution Process provides a systematic way to work with your supervisor, human resources team, facility leadership and, if requested, a panel of your colleagues, to address disputes quickly.  In certain cases, you can request binding arbitration, which is a legal process involving an outside, impartial third party.

[Exhibit A-2, p. 10].

6

The Brochure contained a briefer bullet-point version of the policy in the

At-A-Glance section:

> Employment Dispute Resolution Process (HR.OP.011) – A formal 4-step process to resolve certain employment-related claims, disputes and problems in a fair and reasonable manner, including peer review, if requested, and binding arbitration for the types of claims that can otherwise be heard in court.

[Exhibit A-2, p. 15].

In August, 2008, a group of black female employees who were directly

supervised by Nabors reported acts of racial discrimination to Nabors.  Nabors

directed these employees to file an ethics complaint.  She also notified the Patient

Access Director, Patti Tompkins, and Regional Patient Access Director, Harriet

Palombo, of the claims, and requested a meeting to initiate an investigation.

Nabors alleges that Patti Tompkins, Harriet Palombo and Kathleen O'Sullivan,

human resources director, failed to conduct an investigation into the

discrimination complaint.  As a result of filing the ethics complaint, Nabors

alleges that she was subjected to retaliation and a hostile work environment,

particularly by Shelly Lee, Patient Access Director in 2009.

On June 28, 2010, Nabors was terminated from employment with HSS.

Subsequently, Nabors requested peer review of her termination pursuant to HSS's

Employment Dispute Resolution Process.

7

By letter dated September 10, 2010, Kathleen O'Sullivan advised Nabors that the Peer Review Panel had decided to uphold her termination from employment from HHS.  [rec. doc. 4, Exhibit A-4].  The letter further advised that if Nabors desired to avail herself of the next step, she could appeal to HSS's Chief Executive Officer, Rick King, with further recourse to an independent neutral arbitrator from the American Arbitration Association.

By letter dated September 21, 2010, Rick King denied Nabors' appeal.  [rec. doc. 4, Exhibit A-5].  He further advised that she could initiate a request for Mandatory Binding Arbitration within 30 days.  By letter dated October 22, 2010, Nabors advised Rick King that she desired to initiate a request for arbitration. [Exhibit A-6].

On April 5, 2011, Nabors' counsel sought leave to amend the arbitration pleadings to assert new claims for race discrimination and retaliation.  [rec. doc. 4, Exhibit B].  By Order dated August 2, 2011, the arbitrator issued a ruling on HSS's motion to dismiss certain claims.  In the Order, the arbitrator granted Nabors leave to amend to assert state law claims of intentional discrimination under La. R.S. 23:312 based on events taking place in the year prior to April 5, 2011 only.

Additionally, the arbitrator dismissed Nabors' state law discrimination claim under La. R.S. 23:312 based on events which took place prior to April 5, 2011 only.  The arbitrator also dismissed Nabors' claim under Title VII for failure to file a timely charge of discrimination with the EEOC, and the retaliation claim under state law on the grounds that Louisiana law failed to provide for such claim.[2]

On August 24, 2011, the arbitration hearing commenced.  Two witnesses testified at the proceedings.  The hearing was scheduled to continue on August 25, 2011.  However, plaintiff's counsel advised that she had a scheduling conflict and would not be able to attend the hearing that morning.  Accordingly, the arbitrator adjourned the proceedings.

By Order dated September 29, 2011, the arbitrator reset the hearing to December 14-16, 2011.  [rec. doc. 4, Exhibit C].

On, September 21, 2011, Nabors filed suit in the 15th Judicial District Court, Lafayette Parish, Louisiana, against HSS under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., La. R.S. 23:323, 23:967, 42:1169, and state tort law.  HSS removed this action to this Court on the basis of federal question jurisdiction under Title VII and 42 U.S.C. § 1981 on October 21, 2011.

---

[2]The arbitrator denied Nabors' retaliation claim on the grounds that Louisiana law provides a remedy for employment-based retaliation in only two circumstances: age discrimination and sickle cell trait.  La. R.S. 23:312(D) (age), 23:352(D) (sickle cell trait).

On October 28, 2011, HSS filed the instant Motion to Dismiss and Compel Arbitration.  [rec. doc. 4].

## LAW AND ANALYSIS

### Standard for Motion to Dismiss

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir.2007) (*internal quotations omitted*) (*quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).  "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Breaches Litig.*, 495 F.3d at 205 (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.* (*quoting Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964-65 (citations, quotation marks, and brackets omitted)

10

(emphasis added).

## **Right to Arbitration**

Defendants assert that this case must be dismissed, because plaintiff's exclusive remedy lies in binding arbitration.  Alternatively, defendants argue that the parties should be compelled to arbitrate, and that this action should be stayed pending the arbitration pursuant to the Federal Arbitration Act ("FAA").

The Policy provides that "[this] Agreement shall be governed exclusively by and interpreted exclusively under the Federal Arbitration Act, 9 U.S.C. §§ 1-16 giving effect to that Act's liberal policy toward enforcement of arbitration agreements."[3]   [rec. doc. 4, Exhibit A-1, p. 12].

The FAA provides as follows:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

---

[3]The parties do not dispute that the FAA applies in this case.

In determining whether the parties have agreed to arbitrate the dispute in question, courts generally conduct a two-step inquiry. *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008); *PaineWebber Incorporated v. The Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453, 462 (5th Cir. 2001). The first step is to determine whether the parties agreed to arbitrate the dispute in question. *Id*. This determination involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute falls within the scope of that arbitration agreement. *Id*.

Here, the Policy provides that claims relating to involuntary terminations and employment discrimination and harassment claims based on race are subject to arbitration. The parties agree that this dispute falls within the scope of the arbitration agreement.

Thus, the only issue presented in this case is whether the parties agreed to arbitrate. When deciding whether the parties agreed to arbitrate the dispute in question, "courts generally . . . should apply ordinary state-law principles that govern formation of contracts." *Webb v. Investacorp, Inc.,* 89 F.3d 252, 258 (5th Cir. 1996) (*citing First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995)).

12

In applying state law, however, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration." *Id*. (*citing Volt Info. Sciences, Inc. v. Board of Trustees of Leland Standford Jr. Univ.*, 489 U.S. 468, 475-76, 109 S.Ct. 1248, 1253-54, 103 L.Ed.2d 488 (1989)).  The second step is to determine "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Id*. (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985)).

The question of whether the parties formed a valid agreement to arbitrate is a matter governed by principles of state contract law, in this case the contract law of Louisiana.[4]  *May v. Higbee Co.*, 372 F.3d 757, 764 (5th Cir. 2004).  Under Louisiana law, formation of a valid and enforceable contract requires capacity, consent, a certain object, and a lawful cause.  *Wallace v. Shreve Memorial Library Crowe*, 79 F.3d 427, 430 n. 4 (5th Cir. 1996); *Belin v. Dugdale*, 45,405 (La. App. 2 Cir. 6/30/10); 43 So.3d 272, 278; LA. CIV. CODE ANN. arts. 1918, 1927, 1966, 1971, 2029 (2008).

---

[4]The parties agree that Louisiana law applies to this issue.

Nabors first argues that the Louisiana state arbitration law, which tracks the language of the FAA, requires arbitration agreements to be in writing, and there was no written agreement to arbitrate in this case.[5]  La. R.S. 9:4201.  HSS asserts that the Policy is a binding contract because once it was instituted in 2006, referred to in the Handbook in 2009, and distributed in 2010, it became a condition of Nabors' employment.  [rec. doc. 4, p. 8].  The incorporation of an arbitration clause by reference to another written contract is a suitable method of evidencing the parties' intent to arbitrate as long as the arbitration clause in the contract that is referred to has "a reasonably clear and ascertainable meaning." *Regions Bank v. Weber*, 2010-1169 (La. App. 4 Cir. 12/15/10);   53 So.3d 1284, 1290 (La. App. 4 Cir. 2010) (*quoting Dufrene v. HBOS Manufacturing, LP*, 03-2201, p. 5 (La. App. 4 Cir. 4/7/04); 872 So.2d 1206).

Here, the arbitration agreement was written in the Policy, the Handbook, and the Brochure.  While the Handbook expressly provides that "NEITHER THIS HANDBOOK NOR ANY PROVISION OF THIS HANDBOOK IS AN EMPLOYMENT CONTRACT OR ANY OTHER TYPE OF CONTRACT."  [rec. doc. 4, Exhibit A-3, p. 1].  However, the Policy *does not* provide that it is not

---

[5]In the state of Louisiana, the law's favorable treatment of arbitration agreements "echoes the Federal Arbitration Act."  *Hill v. Hornbeck Offshore Services, Inc*., 799 F.Supp.2d 658 (E.D. La. 2011) (*quoting Aguillard v. Auction Mgmt. Corp*., 908 So.2d 1 (La. 2005)).

contractual in nature.  The Policy states as follows:

### MANDATORY BINDING ARBITRATION AGREEMENT

IN CONSIDERATION AND AS A MATERIAL CONDITION OF THE EMPLOYMENT AND CONTINUATION OF EMPLOYMENT OF THE EMPLOYEE AS OF THE DATE THIS MANDATORY BINDING ARBITRATION POLICY ("Policy") BECOMES EFFECTIVE, THE EMPLOYEE AND THE EMPLOYER AGREE TO SUBMIT FOR RESOLUTION PURSUANT TO THIS Policy ANY DISPUTE SUBJECT TO THE PROCEDURES FOR ARBITRATION ("Procedures") SET FORTH ABOVE (WHICH ARE SPECIFICALLY INCORPORATED HEREIN) AND FURTHER AGREE THAT ARBITRATION PURSUANT TO THIS Policy IS THE EXCLUSIVE MEANS FOR RESOLUTION OF SUCH DISPUTE AND THAT BOTH THE EMPLOYER AND EMPLOYEE HEREBY WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO RESOLVE ANY DISPUTE THROUGH ANY OTHER MEANS, INCLUDING A JURY TRIAL OR A COURT TRIAL IN A LAWSUIT, EXCEPT AS EXPRESSLY PROVIDED IN THIS Policy.

[rec. doc. 4, Exhibit A-1, pp. 6-7].

The Policy contains a signature line. No Policy statement containing Nabors' signature was presented to the Court.  While the Policy was not signed by Nabors, it is well-settled, as Nabors acknowledges, that Louisiana contract law does not require written acceptance of an arbitration agreement to make the agreement binding.  *Marino v. Dillard's, Inc.*, 413 F.3d 530 (5th Cir. 2005) (An agreement may be written and the consent thereto may be made orally or by the action or inaction of the parties, thus no signing of the writing is required."); *In re*

*Succession of Taravella*, 98-834 (La. App. 5 Cir. 4/27/99); 734 So.2d 149, 151 ("When an agreement [to arbitrate] lacks a signature, the actions and the conduct of the party or parties, who did not sign, may show the effect or validity of the agreement."); *Rico v. Manufactured Housing, Inc*., 2005-141 (La. App. 3 Cir. 6/1/05); 903 So.2d 1284; *Hurley v. Fox*, 520 So.2d 467 (La. App. 4th Cir. 1988).

Additionally, Louisiana courts have held that no requirement exists that an arbitration agreement be contained in a single document in order to be part of a contract, but, rather, can be incorporated by reference.  *Lamarque v. Barbara Enterprises*, 2006-1422 (La. App. 4 Cir. 4/25/07); 958 So.2d 708, 712.  Here, the undersigned holds that Nabors evidenced her acceptance of the agreement by: (1) continuing her employment with HSS, and (2) instituting the arbitration proceedings.

Next, Nabors argues that the arbitration provision is illusory and unenforceable because the company had the right to unilaterally amend or modify the agreement regarding any personnel policy.  Louisiana jurisprudence recognizes that certain contractual terms, especially when contained in dense standard forms that are not negotiated, can be too harsh to justly enforce.  *Iberia Credit Bureau, Inc. v. Cingular Wireless, LLC*, 379 F.3d 159, 167 (5th Cir. 2004). The theory of such decisions, often, is that an unconscionable contract or term lacks the free

16

consent that the Louisiana Civil Code requires of all contracts.  *Id*. (*citing* Ronald L. Hersbergen, *Unconscionability: The Approach of the Louisiana Civil Code*, 43 La. L. Rev. 1315 (1983).

In order to be invalidated, a provision must possess features of both adhesionary formation and unduly harsh substance.  *Id*. (*citing Andry v. New Orleans Saints*, 820 So.2d 602, 603-04 (La. App. 5 Cir. 2002) ("[A]dhesion contracts are not *per se* unenforceable, but rather lend themselves to an inquiry as to whether the weaker party consented to the fine print, and if so whether the adhesionary clause is unduly burdensome or extremely harsh.").  *Id*. at 168 (*quoting* Saúl Litvinoff, *Consent Revisited: Offer Acceptance Option Right of First Refusal and Contracts of Adhesion in the Revision of the Louisiana Law of Obligations*, 47 La. L. Rev. 699, 758 (1987) ("[W]here a party had no power to negotiate a contract, [the Louisiana courts] may disregard a particular clause in the contract when that clause is unduly burdensome or extremely harsh.")).

Nabors cited authorities from Texas to support her argument that the arbitration clause is unenforceable because HSS reserved the right to unilaterally abolish or modify any personnel policy without prior notice.[6]  The Handbook

---

[6]*J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223 (Tex. 2003); *In re C & H News Co.*, 133 S.W.3d 642 (Tex. App. 2003).

contains the following provision which supports that argument:

> The Facility [HSS] **reserves the right to rescind, modify or deviate** from these or other **guidelines, policies, practices or procedures relating to employment matters** from time to time as it considers necessary **in its sole discretion**, either in individual or Facility-wide situations **with or without notice**.

(emphasis added).  [Exhibit A-3, p. 61].

However, as pointed out by HSS at the second hearing, the language regarding its unilateral ability to  abolish or modify any personnel policy without prior notice is contained *only* in the Handbook, which expressly states that it is not an employment contract, or indeed any type of contract.  [rec. doc. 4, Exhibit A-3, p. 1].  The Policy, which contains the arbitration agreement, contains no such language.  In fact, the Policy equally binds HHS and the employee. [rec. doc. 4, Exhibit A-1].  Thus the arbitration agreement is clearly a mutual obligation (as opposed to being illusory) which requires arbitration by both parties.

HSS argues that by continuing her employment, Nabors consented to the arbitration policy.  In support of HSS's argument, it cites *Lee v. Coca-Cola Enterprises, Inc*., 2008 WL 920742 (W.D. La. March 4, 2008).  There, the plaintiff was employed by Coca-Cola Enterprises in its Shreveport facility from 1985 until he was terminated in 2006.  In 2004, Coca-Cola instituted an arbitration program called Solutions.  Two weeks prior to implementing the program, it sent a letter to

all employees, including the plaintiff, at their home addresses stating that it had adopted Solutions "as the exclusive means of resolving workplace conflict and will be implementing the program in stages across the company."  The letter provided that, "Effective October 15, 2004, all Coca-Cola Enterprises employees working in . . . Shreveport . . . agree to resolve all legal claims and other workplace conflicts through Solutions rather than through court."  *Id*. at *1.

The letter included a brochure, which, under the heading "Our Mutual Commitment," stated that the company "has adopted Solutions as the exclusive means of resolving workplace conflicts." The brochure then continued: "This means the Company and all employees who accept or continue employment with the Company agree to resolve all legal claims against the Company or any employee through Solutions rather than through court."  *Id*. at *1.

Also included with the letter was a copy of a summary of the Solutions Program which, under the heading "Mutual Commitment," provided as follows:

> The Company is committed to resolve any Legal Disputes or other conflicts with an Employee through Solutions rather than through court. Similarly, *by accepting or continuing employment with the Company after the Effective Date of the program, you agree to use Solutions to resolve any Legal Disputes* or other Conflicts with the Company or an employee through Solutions rather than through court.  (Emphasis in original.)

*Id*. at *2.

After the plaintiff was terminated, he filed an employment discrimination claim against Coca-Cola alleging racial discrimination in violation of Title VII and other federal and state employment laws.  In response, Coca-Cola filed a motion to compel arbitration.  The plaintiff opposed the motion on the grounds that his signature on a sign-in sheet showing that he was present at a meeting where Solution was explained was insufficient to create a contractual agreement to arbitrate.  He did not challenge the lawfulness of the terms of the agreement.

Judge Hornsby held that the plaintiff consented to arbitration when he continued his employment with Coca-Cola after being told that continued employment would constitute consent to the arbitration agreement.  In reaching this determination, Judge Hornsby reasoned as follows:

> Plaintiff . . . focuses his attention on the document he signed and an argument that the document is not sufficient to consent to arbitration. There is no requirement, however, that Plaintiff have ever signed any document to be bound by the terms by the arbitration agreement. The Fifth Circuit explained in *Marino* that Louisiana law does not require written acceptance of an arbitration agreement and that action or inaction by the employee may bind him if it is clearly indicative of consent. This point is emphasized in *Omni Hotels Management Corp. v. Bayer*, 235 Fed. Appx. 208 (5th Cir. 2007), a case in which employees were provided a copy of an arbitration agreement that stated that continued employment was predicated on the employee's agreement to arbitrate and that continued employment provided consideration for the agreement. The employees were also given a receipt that they were requested to sign as proof of notice. Several employees refused to sign, in some cases writing "refused" on the

receipt, but they continued to work for the company. The district court ordered all of the employees to arbitrate because their continued employment evidenced their consent to the arbitration agreement. The Fifth Circuit affirmed, with the observation: "The district court was correct that the employees were bound by the agreement under Louisiana law even if they refused to sign it[.]" *Omni Hotels*, 235 Fed. Appx. at 211.

*Id*. at *4.

Here, unlike *Lee*, the Handbook and the Brochure did not expressly state that continued employment was predicated on the employee's agreement to arbitrate.  However, it is clear that Nabors knew about the arbitration agreement because she invoked the arbitration policy and, in fact, actually commenced arbitration proceedings.

Absent a signed agreement, the consent to an arbitration agreement may be shown by the actions and conduct of the parties.  *Rico*, 903 So.2d at 1289;  *Hurley*, 520 So.2d at 468; *Dufrene, supra,* at 213 (arbitration agreement found valid where parties signed both the bill of sale for mobile home and arbitration agreement addendum agreeing to terms including the provision for arbitration, and plaintiff filed a motion to stay proceedings pending arbitration to indicate his intention to arbitrate).

Under the circumstances of this case, the plaintiff's actions in continuing her employment with HSS after being notified about the Policy and, significantly,

21

in thereafter invoking the arbitration process and commencing arbitration, constituted consent to the arbitration policy.

At the hearing on the Motion to Dismiss and Compel Arbitration, I gave Nabors the opportunity to brief supplement her opposition regarding whether a Louisiana whistle-blower claim is subject to arbitration.  Nabors submitted her brief, but failed to address this issue.  The Court's independent research, has failed to disclose any authority for this proposition.

Accordingly, for the above reasons and recognizing the liberal federal policy favoring arbitration, the undersigned finds that this dispute is subject to arbitration.  *Mouton v. Metropolitan Life Insurance Company*, 147 F.3d 453, 456 (5th Cir. 1998) (*citing Moses H. Cone Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)) ("questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration . . . The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

## Requested Relief

HSS asserts that dismissal of plaintiff's case is appropriate under the FAA. Section 3 of the FAA, 9 U.S.C. § 3, provides for a stay of legal proceedings

22

whenever the issues in a case are within the scope of an arbitration agreement.  *In re Complaint of Hornbeck Offshore (1984) Corporation*, 981 F.2d 752, 754 (5th Cir. 1993).  This provision is mandatory: "If the issues in a case are within the reach of the agreement, the district court has no discretion under section 3 to deny the stay."  *Id.*, quoting *Midwest Mechanical Contractors, Inc. v. Commonwealth Constr. Co.*, 801 F.2d 748, 751 (5th Cir. 1986).[7]

Accordingly, the undersigned recommends that the motion to compel arbitration be **GRANTED**, and that this case be **STAYED** pending arbitration.

## Conclusion

For the foregoing reasons, it is recommended that the motion to compel arbitration filed by HHS be **GRANTED,** and that this case be **STAYED AND ADMINISTRATIVELY CLOSED** pending arbitration.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING**

---

[7]The undersigned recognizes that the weight of authority supports dismissal of the case when all of the issues raised must be submitted to arbitration.  *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161 (5th Cir. 1992).  (emphasis in original).  However, the undersigned finds that equity, in this case, dictates that this matter should not be dismissed because of potential prescription issues.

THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME
AUTHORIZED BY FED. R. CIV. P 6(b), SHALL BAR AN AGGRIEVED
PARTY FROM ATTACKING EITHER THE FACTUAL FINDINGS OR
THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT,
EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED
SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3d. 1415 (5th Cir. 1996).

Counsel are directed to furnish a courtesy copy of any objections or
responses to the District Judge at the time of filing.

July 5, 2012, at Lafayette, Louisiana.


_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE